EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico<br>    Recurrido<br><br>        v.<br><br>Waldemar Fernández Rodríguez<br>    Peticionario | Certiorari<br><br>2013 TSPR 27<br><br>188 DPR ____ |

Número del Caso: CC-2009-622

Fecha: 1ro de marzo de 2013

Tribunal de Apelaciones:

        Región Judicial de San Juan, Panel III

Abogados de la Parte Peticionaria:

        Lcdo. Carlos Ramos Pantoja
        Lcda. Carmen D. Ruiz López
        Lcdo. René Muñoz Castillo

Oficina de la Procuradora General:

        Lcda. Zaira Girón Anadón
        Subprocuradora General

Materia: En Reconsideración – Procedimiento Criminal – Evidencia real obtenida como producto de declaraciones realizadas por un abogado en violación del privilegio abogado-cliente; doctrina del "fruto del árbol ponzoñoso"; derecho a la no autoincriminación.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


El Pueblo de Puerto Rico

    Recurrido

        v.                          CC-2009-622      Certiorari

Waldemar Fernández Rodríguez

    Peticionario



Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

**(En Reconsideración)**

San Juan, Puerto Rico, a 1 de marzo de 2013.

En el presente caso nos corresponde determinar si procede la supresión de evidencia real obtenida como producto de las declaraciones realizadas por un abogado en violación al privilegio abogado-cliente por alegadamente considerarse "fruto del árbol ponzoñoso".

El 9 de diciembre de 2011 emitimos una Opinión en el presente caso, Pueblo v. Fernández Rodríguez, 183 D.P.R. 770 (2011), en la que resolvimos que constituye materia privilegiada inadmisible en evidencia toda información ofrecida a un agente del orden público por el abogado de una persona que lo vincula con conducta delictiva, sin

que esa persona haya renunciado al privilegio abogado-cliente. Asimismo, suprimimos toda evidencia real obtenida como producto de la información revelada al agente del orden público, conforme a la normativa sobre el privilegio abogado-cliente y la garantía constitucional a la no autoincriminación.[1]

Por la presente, reconsideramos nuestra posición con el único efecto de establecer que la doctrina del "fruto del árbol ponzoñoso" no se extiende para suprimir evidencia real obtenida como producto de una violación al privilegio abogado-cliente.[2]

I

Los hechos que son pertinentes se encuentran perfectamente reseñados en la Opinión que hoy reconsideramos, Pueblo v. Fernández Rodríguez, supra, págs. 776-783, y que pasamos a reproducir:

> El caso que nos ocupa tiene su génesis en un doble asesinato ocurrido el 1 de noviembre de 2006, en el Barrio Venezuela de Río Piedras. Se deduce del legajo, que en horas de la tarde de ese día Waldemar Fernández Rodríguez acudió al Cuartel General de la Policía (Cuartel General) en compañía de su abogado, Lcdo. Luis Carbone, y de su amigo, también abogado, el Lcdo. Ovidio Zayas. Una vez en el Cuartel General, el señor Fernández Rodríguez, el licenciado Carbone y el licenciado Zayas fueron entrevistados por el Sargento José Curbelo Muñiz, adscrito a la División de Homicidios. Véase Apéndice de la Petición de *certiorari*, pág. 15.
> A preguntas del sargento Curbelo, el licenciado Carbone expresó que en ese momento su cliente no

---

[1] Contra esa determinación, el Procurador General compareció el 28 de diciembre de 2011 mediante una Solicitud de Reconsideración.

[2] Debido a que la controversia en este caso gira en torno a una violación al privilegio abogado-cliente y no al derecho contra la autoincriminación, únicamente discutimos y resolvimos si procede la supresión de evidencia real obtenida como producto de una violación al privilegio-abogado cliente.

emitiría declaración alguna sobre los hechos, pero que posteriormente sí lo haría. Consecuentemente, el sargento Curbelo le leyó las advertencias de ley al señor Fernández Rodríguez y este las firmó en presencia de su abogado. Luego, el señor Fernández Rodríguez fue puesto en una celda bajo la custodia de otros agentes. Acto seguido, el sargento Curbelo se reunió aparte y a solas con el licenciado Carbone para indagar sobre el arma con que alegadamente se habían cometido los asesinatos. Véase Apéndice de la Petición de *certiorari*, págs. 15-16.

A raíz de la investigación de los hechos, se presentaron sendas denuncias contra el peticionario. El 3 de enero de 2007 se celebró la vista al amparo de la Regla 6 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. El peticionario estuvo representado por varios abogados, entre ellos el licenciado Carbone. Éstos no objetaron el testimonio en cuestión del sargento Curbelo. Escuchada la prueba, se determinó causa probable para arresto contra el señor Fernández Rodríguez. La vista preliminar fue señalada para el 17 de enero de 2007. Véase Apéndice de la Petición de *certiorari*, pág. 145.

Luego de varias suspensiones, la vista preliminar comenzó el 25 de mayo de 2007, y se extendió por varios meses. Ese día las partes estipularon la siguiente prueba: (1) el informe de balística; (2) la prueba de ADN; (3) el análisis forense de la ropa incautada al señor Fernández Rodríguez; (4) servilletas y marcas de sangre de uno de los occisos; y (5) el registro del arma de fuego y la licencia de tiro al blanco del señor Fernández Rodríguez. Véase Apéndice de la Petición de *certiorari*, págs. 146-147.

Posteriormente, en la continuación de la vista preliminar los días 25 y 29 de octubre de 2007, el Ministerio Público presentó como parte del desfile de prueba siete testigos, entre los que figuró el sargento Curbelo. Este declaró que el día 1 de noviembre de 2006, como a las 5:00 p.m., escuchó por radio que hubo una muerte violenta en la barriada Venezuela de Río Piedras, por lo que se personó al lugar. Estando en la escena, fue instruido para que acudiera al Cuartel General debido a que allí se encontraba una persona relacionada a los hechos acaecidos acompañado de dos abogados. El testigo añadió que en el Cuartel General entrevistó al licenciado Carbone y que este le indicó que representaba al señor Fernández Rodríguez. Específicamente, señaló que el licenciado Carbone le expresó que el señor Fernández Rodríguez no haría declaración alguna en ese momento ya que estaba muy nervioso y que posteriormente ofrecería una declaración completa de los hechos ocurridos. Véase Transcripción de Vista Preliminar de 25 y 29 de octubre de 2007, págs. 6-9, CC-2009-0622, Pieza 2.

El sargento Curbelo declaró, además, que con posterioridad a que el licenciado Carbone le informara que su cliente guardaba relación con los hechos ocurridos en la barriada Venezuela, ellos tres (el señor Fernández Rodríguez, el licenciado Carbone y él) se ubicaron en una oficina del cuartel para hacerle las advertencias de ley al imputado. Así, señaló que el señor Fernández Rodríguez leyó las advertencias de rigor y las firmó en presencia de su abogado. Continuó narrando que el señor Fernández Rodríguez fue puesto bajo la custodia de otro agente en un lugar distinto a la oficina donde se encontraban, por lo que procedió a entrevistar a solas al licenciado Carbone. Véase Transcripción de Vista Preliminar de 25 y 29 de octubre de 2007, págs. 46-47 y 49, CC-2009-0622, Pieza 2.

Así las cosas, el sargento Curbelo declaró que durante la entrevista el licenciado Carbone manifestó que su cliente era extorsionado por los occisos desde hacía un tiempo. De inmediato, el sargento Curbelo inquirió al licenciado Carbone sobre la localización del arma de fuego utilizada para cometer los asesinatos, a lo que este contestó que estaba tirada en una jardinera de una casa aledaña al área de los hechos. Con esa información, el sargento Curbelo procedió a llamar a la agente Daliza Ortiz Claudio, quien se encontraba en la escena del crimen. Una vez estableció comunicación con la agente, el sargento Curbelo pasó el teléfono al licenciado Carbone para que este explicara a la agente Ortiz Claudio los detalles sobre la ubicación exacta del arma. Al no poder localizar el cargador ni las municiones, pero sí el arma de fuego, la agente Ortiz Claudio llamó de vuelta al sargento Curbelo para explicarle lo sucedido. Así, el sargento Curbelo la comunicó nuevamente con el licenciado Carbone y este le indicó a la agente dónde estaban el cargador y las municiones. Véase Transcripción de Vista Preliminar de 25 y 29 de octubre de 2007, págs. 12-14, CC-2009-0622, Pieza 2.

En su contrainterrogatorio, el sargento Curbelo reconoció que la información abogado-cliente es de naturaleza privilegiada. De igual forma, a preguntas de la defensa, indicó que una vez le hizo las advertencias de ley al señor Fernández Rodríguez no le preguntó si iba a emitir una declaración, ya que el licenciado Carbone le había dicho expresamente que su cliente no iba a hacer manifestación alguna porque se encontraba muy nervioso. Asimismo, el testigo añadió que, a su entender, el señor Fernández Rodríguez no había hecho renuncia alguna a su privilegio abogado-cliente, como tampoco autorizó al licenciado Carbone a que declarara por él. Véase Transcripción de Vista Preliminar de 29 de octubre de 2007 y 7 de mayo de 2008, págs. 47-52, CC-2009-0622, Pieza 2. Finalmente, durante su contrainterrogatorio, el sargento Curbelo admitió que no preguntó al señor

Fernández Rodríguez si renunciaba a sus derechos constitucionales y que este no había autorizado al licenciado Carbone a divulgarle información privilegiada. Íd.

En consecuencia, el señor Fernández Rodríguez solicitó que se suprimiera el testimonio del sargento Curbelo, así como la evidencia ocupada. En apoyo de su petitorio, el imputado adujo que el testimonio del sargento Curbelo era inadmisible debido a que era producto de una declaración confidencial que él le hizo a su abogado, que esta declaración era de naturaleza privilegiada y que estaba cobijada por el privilegio abogado-cliente. También alegó, que el arma y las municiones ocupadas constituían frutos del árbol ponzoñoso pues su descubrimiento fue producto directo de una conversación privilegiada. Véase Apéndice de la Petición de *certiorari*, pág. 146.

Luego de diversos trámites procesales, en febrero de 2008 el Tribunal de Primera Instancia emitió una resolución mediante la cual descalificó al licenciado Carbone como abogado del señor Fernández Rodríguez y lo citó para que compareciera como testigo a la vista de supresión de evidencia. Además, el foro primario citó como testigo al licenciado Zayas, quien estuvo presente en ciertas conversaciones entre el licenciado Carbone y el imputado Fernández Rodríguez. Todo ello en aras de escudriñar adecuadamente la solicitud de supresión del testimonio del sargento Curbelo. Véase Apéndice de la Petición de *certiorari*, pág. 146. Véase, además, Transcripción de Vistas de 29 de octubre 2007 y 7 de mayo de 2008, págs. 106-108, CC-2009-0622, Pieza 2.

Así, pues, el 7 de mayo de 2008 el Tribunal de Primera Instancia celebró una vista de supresión de evidencia en la que testificaron el licenciado Carbone y el licenciado Zayas, entre otros. En esencia, el licenciado Carbone negó haber informado al sargento Curbelo sobre la localización del arma, cargador y municiones debido a que no estuvo en el lugar de los hechos y desconocía totalmente esta información. Véase Transcripción de Vistas de 29 de octubre 2007 y 7 de mayo de 2008, págs. 106-108, CC-2009-0622, Pieza 2. Véase, además, Apéndice de la Petición de *certiorari*, pág. 146. Por su parte, el licenciado Zayas testificó, en lo pertinente, que el 1 de noviembre de 2006 acompañó al señor Fernández Rodríguez al Cuartel General en calidad de amigo y no como su abogado. Véase Apéndice de la Petición de *certiorari*, págs. 146-147.

Culminada la vista de supresión de evidencia, el 9 de mayo de 2008 el Tribunal de Primera Instancia dictó dos resoluciones. En la primera de ellas, el foro primario declaró *no ha lugar* la moción de supresión de evidencia presentada por el señor Fernández Rodríguez. En el referido dictamen, el tribunal de instancia señaló que no confirió credibilidad al testimonio del licenciado Carbone

ni al del licenciado Zayas porque habían omitido hechos importantes y fueron inconsistentes sus declaraciones. Véase Apéndice de la Petición de *certiorari*, pág. 147.

Cónsono con lo anterior, el tribunal primario sostuvo que no se había violado el privilegio abogado-cliente del señor Fernández Rodríguez. Ello, debido a que su intención siempre fue acudir al Cuartel General para entregarse. A esos efectos, añadió que Fernández Rodríguez compareció acompañado y asesorado por su abogado, el licenciado Carbone, se presentó con la intención de hacer unas declaraciones sobre un doble asesinato que había ocurrido esa misma tarde y estuvo presente cuando su abogado divulgó la razón para su comparecencia. Véase Apéndice de la Petición de *certiorari*, págs. 65 y 146-147.

Por otra parte, en la segunda resolución, el Tribunal de Primera Instancia determinó causa probable para acusar por dos cargos de asesinato, dos cargos al amparo del Art. 5.15 y un cargo por infracción al Art. 5.04 de la Ley Núm. 404-2000, según enmendada, conocida como Ley de Armas de Puerto Rico. Véase Apéndice de la Petición de *certiorari*, pág. 65.

Subsiguientemente, el 16 de mayo de 2008 el Pueblo presentó las acusaciones según autorizadas contra el señor Fernández Rodríguez. El 9 de junio del mismo año, el imputado presentó una *Moción de Desestimación* al amparo de la Regla 64(p) de Procedimiento Criminal, 34 L.P.R.A. Ap. II. En su escrito adujo que la determinación de causa probable para acusar fue contraria a derecho debido a que la prueba presentada en la vista preliminar era inadmisible e ilegal por ser producto de información privilegiada, la cual fue confiada por el imputado a su representante legal. Además, señaló que la única prueba que lo ataba a los hechos era el testimonio del sargento Curbelo y que, siendo el mismo inadmisible, la determinación de causa probable era contraria a derecho. Oportunamente, el 7 de agosto de 2008 la Fiscalía presentó su oposición al petitorio de desestimación presentada por el imputado. Véase Apéndice de la Petición de *certiorari*, págs. 65-69.

Luego de varias incidencias procesales, el 29 de diciembre de 2008 el foro primario emitió una resolución en la que denegó la solicitud de desestimación del imputado. En su dictamen puntualizó que aunque el señor Fernández Rodríguez no renunció a su privilegio abogado-cliente, el testimonio del sargento Curbelo era admisible. Ello, debido a que el sargento Curbelo actuó conforme a la doctrina de "autoridad aparente". Es decir,

> …el sargento Curbelo estaba convencido de que el licenciado Carbone estaba autorizado a divulgar [la] información que divulgó. Ciertamente aparentaba tenerla. Las propias actuaciones del licenciado Carbone son las que

dan base "a la buena fe de los agentes de la policía y permite llegar a una creencia o conclusión razonable de que la persona que representa tener la autoridad… la tiene". Apéndice de la Petición de *certiorari*, pág. 86.

Inconforme, el 28 de enero de 2009 el imputado presentó un recurso de *certiorari* ante el Tribunal de Apelaciones. El Ministerio Público, por su parte, se opuso oportunamente. Estudiados los argumentos de las partes, el 22 de mayo de 2009 el Tribunal de Apelaciones dictó una sentencia y confirmó la resolución recurrida. Sostuvo que la determinación de causa probable para acusar fue conforme a derecho ya que el peticionario renunció tácitamente al privilegio abogado-cliente. Ello, pues la prueba desfilada reveló que su intención siempre fue acudir al Cuartel General para entregarse. Véase Apéndice de la Petición de *certiorari*, pág. 172.

Además, el foro apelativo intermedio señaló que el peticionario no objetó oportunamente el testimonio del sargento Curbelo durante la vista de causa probable para arresto. Por esta razón, dicho foro coligió que era innecesario que el Tribunal de Primera Instancia aplicara por analogía la doctrina de "autoridad aparente". Apéndice de la Petición de *certiorari,* pág. 172.

Nuevamente insatisfecho, el 21 de julio de 2009 el imputado presentó una petición de *certiorari* ante este Tribunal. En ella señaló la comisión de los errores siguientes:

Erró el Tribunal de Apelaciones al confirmar la resolución del Tribunal de Primera Instancia denegando la moción de desestimación presentada por el peticionario bajo las disposiciones de la Regla 64(p) de Procedimiento Criminal a pesar de que la determinación de causa probable fue contraria a derecho ya que la misma se basó en prueba que legalmente no era admisible.

Es errada la decisión del foro apelativo intermedio a los efectos de que medió una renuncia implícita al privilegio abogado-cliente porque: el peticionario había comparecido voluntariamente al Cuartel General de la Policía en relación a una investigación de unos hechos delictivos; la información ofrecida por el abogado que lo representó en ese momento no fue compelido a ofrecer la información en relación a dónde se encontraba el arma de fuego sino que brindó voluntariamente y sin coacción tal información; y no invocó oportunamente dicho privilegio en el procedimiento judicial seguido en su contra. Petición de *certiorari*, págs. 5-6.

Como señalamos, el 9 de diciembre de 2011 emitimos una opinión en la que determinamos que era inadmisible en evidencia toda evidencia real obtenida como producto de información ofrecida por un abogado en violación al privilegio abogado-cliente. El Procurador General ha comparecido solicitando la reconsideración de tal dictamen.

## II

### A. La regla de exclusión conocida como la doctrina del "fruto del árbol ponzoñoso"

La regla de exclusión conocida como la doctrina del "fruto del árbol ponzoñoso" fue establecida por el Tribunal Supremo federal en Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920), en el contexto de excluir evidencia derivada de una violación a la Cuarta Enmienda de la Constitución de Estados Unidos.[3] En ese caso el Tribunal Supremo federal expresó que "[l]a esencia de la disposición que prohíbe adquirir evidencia de cierta manera, no es meramente que la evidencia así adquirida no será usada en los tribunales, sino que no será usada de ninguna manera".[4]

No obstante, el tratadista estadounidense Wayne R. LaFave explica que la doctrina del "fruto del árbol ponzoñoso" no se limita a los casos en que se ha violado la Cuarta Enmienda, supra, sino que también se ha

---

[3] E.L. Chiesa, Derecho procesal penal: etapa investigativa, Publicaciones JTS, 2006, pág. 127.

[4] Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920).

utilizado cuando han ocurrido otras violaciones constitucionales, como las ruedas de detenidos y las confesiones obtenidas en violación a los derechos constitucionales.[5] Es importante señalar que en el foro federal esta doctrina se ha utilizado mayormente en situaciones en las que se ha obtenido evidencia como producto de arrestos o registros ilegales, interrogatorios ilegales e identificaciones ilegales.[6]

En el 1961 con el caso de <u>Mapp v. Ohio</u>, 367 U.S. 643 (1961), el Tribunal Supremo federal incorporó la regla de exclusión a los estados, a través de la Decimocuarta Enmienda.[7] El caso resolvió que toda evidencia obtenida en violación a la Cuarta Enmienda, *supra*, bien por funcionarios federales o estatales, será inadmisible tanto en las cortes federales como en las cortes estatales.[8] Sin embargo, esta pauta no obligó a los estados a implantar una regla de exclusión con relación a la evidencia obtenida en violación de la ley o el derecho estatal.[9] Esto es, los estados, incluyendo Puerto Rico, están obligados a utilizar la regla de exclusión cuando se obtiene evidencia en violación a la Cuarta Enmienda, pero no así cuando se obtiene evidencia

---

[5] 6 LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> Sec. 11.4, pág. 257 (2004).

[6] 3 LaFave, Israel, King & Kerr, <u>Criminal Procedure</u> Sec. 9.3(a), pág. 419 (2007).

[7] E.L. Chiesa Aponte, <u>Derecho procesal penal de Puerto Rico y Estados Unidos</u>, Colombia, Ed. Forum, 1991, vol. I, pág. 289.

[8] Íd., pág. 290.

[9] Íd.

en violación a un derecho estatal. En esas instancias, Puerto Rico, como cada estado, tiene la discreción de implantar o no la regla de exclusión.

En nuestra jurisdicción, más de una década antes del caso de Mapp v. Ohio, supra, y antes de la promulgación de nuestra Constitución, ya se había incorporado una regla de exclusión mediante jurisprudencia.[10] No obstante, el único propósito de esa regla de exclusión era evitar que funcionarios gubernamentales se beneficiaran de actuaciones claramente ilegales.[11] Luego, los miembros de la Convención Constituyente optaron por incorporar la regla de exclusión creada por el Tribunal Supremo federal en Silverthorne Lumber Co. v. United States, supra, expresamente al texto de la Constitución.[12] Así, y en lo pertinente, el Art. II, Sec. 10 de nuestra Constitución dispone claramente que "evidencia obtenida en violación a esta sección será inadmisible en los tribunales".[13]

**B. Aplicación de la doctrina del "fruto del árbol ponzoñoso" para suprimir evidencia real obtenida en violación a los privilegios probatorios**

**1. Estados Unidos**

---

[10] Véanse: Pueblo v. Rosado, 62 D.P.R. 197 (1943); Pueblo v. Decós, 62 D.P.R. 148 (1943); Pueblo v. Capriles, 58 D.P.R. 548 (1941). Véase, además, Toll y Sucn. Rivera Rojas v. Adorno Medina, 130 D.P.R. 352, 357-358 (1992).

[11] Toll y Sucn. Rivera Rojas v. Adorno Medina, supra, pág. 358.

[12] E.L. Chiesa Aponte, op. cit., pág. 290.

[13] Art. II, Sec. 10. Const. E.L.A., Tomo 1.

Como mencionáramos anteriormente, el foro federal ha utilizado mayormente la doctrina del "fruto del árbol ponzoñoso" cuando se ha obtenido evidencia real como producto de la violación a la Cuarta Enmienda, *supra*. Más aún, aunque el Tribunal Supremo federal nunca ha establecido expresamente que dicha doctrina solo se circunscribe a violaciones a la mencionada enmienda, lo cierto es que, al día de hoy, ese foro no ha resuelto ninguna controversia en la cual se haya aplicado la doctrina del "fruto del árbol ponzoñoso" a evidencia obtenida en violación a uno de los privilegios probatorios, como lo es el privilegio abogado-cliente.

Sin embargo, varios circuitos del Tribunal de Apelaciones federal sí han tenido la oportunidad de expresar si la doctrina del "fruto del árbol ponzoñoso" aplica para suprimir evidencia real obtenida como producto de violaciones a privilegios no constitucionales. Todos los circuitos han llegado a la conclusión de que la doctrina del "fruto del árbol ponzoñoso" **no aplica** cuando se ha obtenido evidencia real en violación a los privilegios probatorios.[14] Estos interpretaron que esa doctrina está limitada a violaciones de privilegios constitucionales. Incluso, el Tribunal de Apelaciones para el Noveno Circuito expresó

---

[14] Véanse: U.S. v. Warshak, 631 F.3d 266 (6th Cir. 2010); U.S. v. Squillacote, 221 F.3d 542 (4th Cir. 2000); Nickel v. Hannigan, 97 F.3d 403 (10th Cir. 1996); U.S. v. Marashi, 913 F.2d 724 (9th Cir. 1990); U.S. v. White, 879 F.2d 1509 (7th Cir. 1989).

que **ningún tribunal ha aplicado la doctrina del "fruto del árbol ponzoñoso" a los privilegios probatorios.**[15]

De manera persuasiva, veamos lo que dos circuitos del Tribunal de Apelaciones federal resolvieron en controversias en las que se quería aplicar la mencionada doctrina para suprimir evidencia obtenida como producto de la violación al privilegio abogado-cliente.

Tan reciente como en el 2010, el Tribunal de Apelaciones para el Sexto Circuito resolvió el caso de U.S. v. Warshak, 631 F.3d 266 (6th Cir. 2010). En ese caso, el gobierno se encontraba investigando a Berkeley Premium Nutraceuticals, Inc. Durante un registro de las oficinas principales, los agentes copiaron el contenido de unas 90 computadoras. Entre los documentos obtenidos se encontraban documentos protegidos por el privilegio abogado-cliente.[16] Además, a través de una orden del tribunal, tuvieron acceso al correo electrónico de la corporación. En el correo electrónico existían más de 60,000 comunicaciones con abogados.[17] El señor Steven Warshak alegó que esos documentos se obtuvieron en violación al privilegio abogado-cliente y, por consiguiente, pidió que se suprimieran. Al respecto, el Tribunal de Apelaciones para el Sexto Circuito resolvió que no encontró ninguna autoridad que indicara que la evidencia derivativa obtenida en violación al privilegio

---

[15] Véase nota al calce 11 en U.S. v. Marashi, supra.

[16] U.S. v. Warshak, supra, pág. 292.

[17] Íd.

abogado-cliente es suprimible.[18]  Al respecto expresó lo

siguiente:

> **[W]e agree that it is unwise to extend the fruit-of-the-poisonous-tree doctrine beyond the context of constitutional violations.[19]** (Énfasis nuestro.)

En Nickel v. Hannigan, 97 F.3d 403 (10th Cir.

1996), el Tribunal de Apelaciones para el Décimo Circuito

negó aplicar la doctrina del "fruto del árbol ponzoñoso"

a la violación del privilegio abogado-cliente.  En este

caso, el Sr. Willie Nickel acudió a la oficina del

abogado Dan Boyer y confesó que había asesinado a una

señora.[20]  Luego de que el señor Nickel se marchara, el

abogado llamó a la Policía e indicó que el señor Nickel

posiblemente había cometido un asesinato.  Más tarde, el

licenciado Boyer llamó al señor Nickel y le aconsejó que

acudiera a la Policía a entregarse.[21]  Siguiendo el

consejo del abogado, el señor Nickel se entregó.  Durante

el interrogatorio, el señor Nickel solicitó un abogado y

se le asignó al abogado William Mize para que lo

representara.  En la vista preliminar, el Ministerio

Público sentó al licenciado Boyer a testificar contra el

acusado.  El licenciado Mize objetó el testimonio

aduciendo que ese testimonio violaba el privilegio

abogado-cliente que existía entre el licenciado Boyer y

el señor Nickel.  Sin embargo, el tribunal permitió el

---

[18] Íd., pág. 294.

[19] Íd.

[20] Nickel v. Hannigan, supra, pág. 405.

[21] Íd.

testimonio.[22]  El licenciado Boyer se sentó nuevamente a testificar en el juicio.  Así las cosas, el señor Nickel fue hallado culpable por asesinato en primer grado.  El señor Nickel alegó que el licenciado Mize violó la Sexta Enmienda al no representarlo adecuadamente, esto por no objetar el testimonio del licenciado Boyer en el juicio.  El Tribunal de Apelaciones para el Décimo Circuito expresó que:

> [A]lthough Mr. Nickel's confession to Detective Marble could be considered the result of Mr. Boyer's breach of Mr. Nickel's attorney-client privilege in reporting Mr. Nickel to the police, **there is no indication that Kansas law requires the exclusion of all evidence derived from a breach of an attorney-client privilege. Further, other courts have refused to apply such a broad evidentiary rule of exclusion to breaches of privilege.**
>
> [R]ejecting the application of the fruit of the poisonous tree doctrine to evidence obtained from a breach of attorney-client privilege and reasoning that "the marginal effectiveness of denying use to an innocent [state] agency for reports produced not by a state but by a private citizen is not justified".[23]  (Énfasis nuestro.)

Por otra parte, también existe jurisprudencia de distintos estados que, al igual que los circuitos del Tribunal de Apelaciones federal, han resuelto que la doctrina del "fruto del árbol ponzoñoso" no aplica a evidencia obtenida en violación a los privilegios probatorios.[24]  Por ejemplo, en el estado de Florida el Tribunal de Apelaciones para el Cuarto Distrito resolvió

---

[22] Íd., pág. 406.

[23] Nickel v. Hannigan, supra, pág. 409.

[24] Véanse: People v. Navarro, 138 Cal. App. 4th 146 (2006); State v. Sandini, 395 So.2d 1178 (1981); Securities and Exchange Commission v. OKC Corp., 474 F. Supp. 1031 (1979).

el caso <u>State v. Sandini</u>, 395 So.2d 1178 (1981). En ese caso, el abogado del acusado violó el privilegio abogado-cliente y ofreció a la Policía cierta información que fue esencial para establecer causa probable para realizar un registro. El tribunal apelativo expresó que no existe justificación suficiente para extender la regla de exclusión para suprimir evidencia obtenida como producto de las declaraciones voluntarias de un abogado en violación al privilegio abogado-cliente.[25] Añadió que el cliente que haya sufrido daños por dicha violación podrá incoar una demanda civil contra el abogado y podrá presentar una queja por violación al Código de Ética Profesional.[26]

Podemos observar que, según los tribunales han interpretado la doctrina del "fruto del árbol ponzoñoso" y los privilegios probatorios, la violación de tales privilegios no conlleva la supresión de los frutos obtenidos.[27] Y es que, los privilegios probatorios proveen una protección limitada a comunicaciones confidenciales. Una de esas limitaciones es que los frutos que se obtengan por comunicaciones no autorizadas, en violación a los privilegios, no son excluidos como

---

[25] <u>State v. Sandini</u>, supra, pág. 1181.

[26] Íd.

[27] R.P. Mosteller, <u>Admissibility of Fruits of Breached Evidentiary Privileges: The Importance of Adversarial Fairness, Party Culpability, and Fear of Immunity</u>, 81 Wash. U. L.Q. 961, 1010 (2003).

evidencia.[28]  La comunicación privilegiada revelada será excluida por hacerse en violación al privilegio, sin embargo no será una justificación para que se excluya la evidencia derivada de dicha comunicación.[29]


## 2. Puerto Rico

Como mencionáramos anteriormente, el caso de Mapp v. Ohio, supra, resolvió que toda evidencia obtenida en violación a la Cuarta Enmienda, *supra,* bien por funcionarios federales o estatales, será inadmisible tanto en las cortes federales como en las cortes estatales.  Sin embargo, los estados pueden optar por no aplicar la regla de exclusión a evidencia obtenida en violación al derecho estatal que no constituye violación a la Cuarta Enmienda, *supra*.[30]  Esto quiere decir que si agentes estatales actúan de manera que violan un derecho estatal, pero no violan la Cuarta Enmienda, *supra*, no es aplicable la regla de exclusión de dicha enmienda.[31]  El derecho estatal determinará si la evidencia es admisible en la corte estatal.[32]

---

[28] Íd., pág. 963.

[29] Íd., pág. 1006.

[30] E.L. Chiesa Aponte, op. cit., págs. 290-291.

[31] E.L. Chiesa, Derecho procesal penal: etapa investigativa, op. cit., pág. 112.

[32] Íd.

Por otro lado, nuestra regla de exclusión es de naturaleza constitucional. En otras palabras, al aprobarse nuestra Constitución en el 1952 Puerto Rico optó por incorporar expresamente la regla de exclusión federal en la Sección 10 de su Carta de Derechos.[33] Desde entonces, la jurisprudencia de esta Curia no se ha apartado de la interpretación del Tribunal Supremo federal con relación al alcance de la regla de exclusión.[34] Esto es, la doctrina del "fruto del árbol ponzoñoso" se ha utilizado por este Tribunal para suprimir evidencia obtenida como fruto de registros ilegales,[35] arrestos ilegales[36] y detenciones ilegales de un vehículo.[37] Además, hemos suprimido confiscaciones producto de registros ilegales,[38] confesiones producto de detenciones y registros ilegales[39] e identificaciones de acusados producto de detenciones ilegales.[40] Sin embargo, nunca hemos avalado la utilización de la regla de exclusión para suprimir evidencia obtenida en violación a

---

[33] Íd.

[34] E.L. Chiesa, Derecho procesal penal: etapa investigativa, op. cit., pág. 132.

[35] Pueblo v. Cedeño Laclaustra, 157 D.P.R. 743 (2002).

[36] Pueblo v. Calderón Díaz, 156 D.P.R. 549 (2002); Pueblo v. Bonilla, 120 D.P.R. 92 (1987).

[37] Pueblo v. Serrano Cancel, 148 D.P.R. 173 (1999); Pueblo v. Yip Berríos, 142 D.P.R. 386 (1997).

[38] Pueblo v. Negrón Martínez II, 144 D.P.R. 873 (1998); Pueblo v. Negrón Martínez I, 143 D.P.R. 1 (1997).

[39] Pueblo v. Miranda Alvarado, 143 D.P.R. 356 (1997); Pueblo v. Rodríguez Rivera, 91 D.P.R. 456 (1964).

[40] Pueblo v. Rey Marrero, 109 D.P.R. 739 (1980).

otros derechos estatales, como lo son los privilegios probatorios.

Antes de incorporar la regla de exclusión a nuestra Constitución, en la Convención Constituyente se presentaron seis proposiciones que disponían sobre la inadmisibilidad de la evidencia obtenida en violación de alguna sección de la Constitución.[41] Luego, en el Informe de la Comisión de la Carta de Derechos se expresó que el propósito de la regla de exclusión era "dar garantía adicional y efectiva a estos derechos [los contenidos en el Art. II, Sec. 10]".[42] Así las cosas, los padres de la Convención Constituyente tomaron la decisión de incorporar esta doctrina al Art. II, Sec. 10 de la Constitución. Fundamentaron su decisión en que existía un interés público de hacer valer la garantía contra registros, detenciones o incautaciones irrazonables.[43]

En el caso de <u>Toll y Sucn. Rivera Rojas v. Adorno Medina</u>, 130 D.P.R. 352, 358-359 (1992), expresamos los propósitos de incluir esta regla de exclusión al Art. II, Sec. 10 de nuestra Constitución. En lo pertinente, expusimos que:

> **[L]a regla de exclusión encarna tres (3) propósitos** ínsitos en el Art. II, Sec. 10, *supra.* **Primero**, disuadir y desalentar a los funcionarios del orden público de que violen la protección constitucional (*deterrence*). Se reconoce que este

---

[41] <u>Toll y Sucn. Rivera Rojas v. Adorno Medina</u>, supra, pág. 356.

[42] 4 Diario de Sesiones de la Convención Constituyente 2568 (1952). Véase, además, <u>Toll y Sucn. Rivera Rojas v. Adorno Medina</u>, supra, pág. 356.

[43] <u>Toll y Sucn. Rivera Rojas v. Adorno Medina</u>, supra, pág. 359.

> elemento disuasivo realmente es el más fundamental. **Segundo**, integridad judicial. Los tribunales no deben ser cómplices de actos de desobediencia a la Constitución y admitir evidencia ilegalmente obtenida. Y **tercero**, impedir que el Gobierno se beneficie de sus propios actos ilícitos; de otra manera la ciudadanía perdería confianza en el Gobierno.[44] (Énfasis nuestro.)

En conclusión y en esencia, la doctrina del "fruto del árbol ponzoñoso" se estableció con el propósito de evitar que los agentes del gobierno obtengan evidencia de forma reñida con la protección constitucional. Esta doctrina no se incorporó en ninguna otra sección de la Constitución y tampoco se ha extendido a ningún otro derecho estatal.

### III

Argumenta el Procurador General que "la supresión de las declaraciones privilegiadas no acarrea la supresión de la evidencia real (el arma, cargador y municiones)". Le asiste la razón al Procurador General. Veamos.

El Tribunal Supremo federal estableció la doctrina del "fruto del árbol ponzoñoso" en violaciones a la Cuarta Enmienda, *supra*. En cuanto a los estados, incluyendo a Puerto Rico, solamente dispuso que tenían que aplicar la regla de exclusión cuando se viola la Cuarta Enmienda, *supra,* ya sea por funcionarios federales o estatales. Sin embargo, no limitó a los estados a utilizar la doctrina en leyes o derechos estatales. Así las cosas, Puerto Rico optó por incorporar la regla de

---

[44] Véase, además, E.L. Chiesa Aponte, op. cit., págs. 284-285.

exclusión al Art. II, Sec. 10 de nuestra Constitución, *supra*. Esto implica que la doctrina en Puerto Rico es de naturaleza constitucional y aplica cuando se obtiene evidencia por registros, detenciones o incautaciones irrazonables. No hemos extendido la doctrina del "fruto del árbol ponzoñoso" cuando se han violado otras leyes o derechos estatales.

Por otra parte, resulta importante advertir que los privilegios probatorios tienen su propia regla de exclusión. Esta regla de exclusión establece que toda **comunicación privilegiada** revelada en violación al privilegio será inadmisible como evidencia. Nótese que la propia regla limita su alcance a la comunicación per se, no incluye aquella evidencia que surja como consecuencia de esa comunicación. Por lo tanto y a tenor con lo anterior, cuando se viola un privilegio probatorio se excluirá únicamente la comunicación que se hizo en violación al privilegio. **En conclusión, no existe ninguna norma en Puerto Rico ni en Estados Unidos que justifique extender la doctrina del "fruto del árbol ponzoñoso" a evidencia real obtenida en violación a estos privilegios.**

En el caso de autos, en primer lugar debemos resaltar el hecho de que el agente del orden público no actuó de manera abusiva ni maliciosa para obtener evidencia de manera ilegal. Quien violó el privilegio abogado-cliente y actuó contrario al derecho vigente fue

el abogado del acusado.[45] Una vez el policía le preguntó al abogado dónde se encontraba el arma, su obligación era levantar el privilegio abogado-cliente, pero no lo hizo. Esa declaración del abogado se hizo en violación al privilegio abogado-cliente y, por lo tanto, esa comunicación privilegiada no es admisible como evidencia. Sin embargo, la evidencia que se obtuvo como fruto de esa comunicación, en este caso el arma, el cargador y las municiones, sí es admisible en evidencia. Esta evidencia real no se obtuvo por actuaciones ilegales de los agentes, en violación al Art. II, Sec. 10 de nuestra Constitución, *supra*, sino por el testimonio que realizó el abogado en violación al privilegio abogado-cliente. Por lo tanto, aplica la regla de exclusión de los privilegios probatorios, mas no la doctrina del "fruto del árbol ponzoñoso" para suprimir la evidencia real obtenida.

El cliente que se ve afectado por la violación al privilegio abogado-cliente tiene dos remedios: 1) presentar una demanda civil por daños contra el

---

[45] Conviene aclarar lo dicho en la Opinión que en parte hoy reconsideramos en el sentido de que "si la información divulgada de forma no autorizada incrimina penalmente… el abogado… viola el derecho a la no autoincriminación de su cliente". Lo que quisimos decir fue lo señalado por los tratadistas Weinstein y Berger en el sentido de la estrecha relación que existe entre esta falta ética y el derecho a la no autoincriminación del cliente; no que el abogado pueda violar tal derecho constitucional. J.B. Weinstein & M.A. Berger, Weinstein's Federal Evidence, Vol. 3, Sec. 503.03[1] (Joseph M. McLaughlin, ed., Mattew Bender 2011); Notes, The Attorney-Client Privilege: Fixed Rules, Balancing, and Constitutional Entitlement, 91 Harv. L.Rev. 464, 480 (1977).

abogado, y 2) procurar una acción disciplinaria contra el abogado.

## IV

Por todo lo anterior, reconsideramos lo resuelto en Pueblo v. Fernández Rodríguez, supra, y establecemos que la regla de exclusión, conocida como la doctrina del "fruto del árbol ponzoñoso", no se extiende para suprimir evidencia real obtenida como producto de una violación al privilegio abogado-cliente.

Siendo así, se modifica la Opinión emitida por esta Curia a los únicos fines de limitar la exclusión de evidencia a las declaraciones del abogado en violación al privilegio abogado-cliente y no extender la exclusión al arma, cargador y municiones ocupadas.

Se dictará sentencia de conformidad.


                              Erick V. Kolthoff Caraballo
                                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

   Recurrido

       v.                  CC-2009-622    Certiorari

Waldemar Fernández Rodríguez

   Peticionario

SENTENCIA

San Juan, Puerto Rico, a 1 de marzo de 2013.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, reconsideramos lo resuelto en Pueblo v. Fernández Rodríguez, 183 D.P.R. 770 (2011), y establecemos que la regla de exclusión, conocida como la doctrina del "fruto del árbol ponzoñoso", no se extiende para suprimir evidencia real obtenida como producto de una violación al privilegio abogado-cliente.

Siendo así, se modifica la Opinión emitida por esta Curia a los únicos fines de limitar la exclusión de evidencia a las declaraciones del abogado en violación al privilegio abogado-cliente y no extender la exclusión al arma, cargador y municiones ocupadas.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera García emitió Opinión Concurrente. La Jueza Asociada señora Fiol Matta concurre con el resultado sin opinión escrita.

El Juez Presidente señor Hernández Denton hace constar la siguiente expresión:

El Juez Presidente señor Hernández Denton disiente de la Opinión mayoritaria, por las mismas razones expuestas en su disenso en Pueblo v. Fernández Rodríguez, 183 D.P.R. 770 (2011).

La Juez Asociada señora Rodríguez Rodríguez disiente sin opinión escrita.


                              Aida Ileana Oquendo Graulau
                              Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

El Pueblo de Puerto Rico

                                              Certiorari

        Recurrido


            v.                      CC-2009-0622


Waldemar Fernández Rodríguez


        Peticionario


Opinión concurrente emitida por el Juez Asociado señor Rivera García.


En San Juan, Puerto Rico, a 1 de marzo de 2013.

El 9 de diciembre de 2011 dictamos la Opinión <u>Pueblo v. Fernández Rodríguez</u>, 183 D.P.R. 770 (2011), donde resolvimos que no podían admitirse en evidencia partes del testimonio que brindó un agente de la policía, porque involucraba materia privilegiada cobijada por el privilegio abogado-cliente. Así también, ordenamos la supresión de la evidencia real producto de dicho testimonio. El 28 de diciembre de 2011 el Procurador General presentó ante esta Curia una moción de reconsideración en la que argumenta que erramos al excluir dicha evidencia y al aplicar en este caso la doctrina del "fruto del árbol ponzoñoso".

Rexaminada la controversia, una mayoría de este Tribunal colige que erramos al excluir los frutos de la divulgación de la comunicación privilegiada porque el Estado no los obtuvo de manera ilegal. Luego de justipreciar el asunto, concurrimos con ello, no obstante, entendemos necesario aclarar ciertos extremos.

I

A

La Opinión en Reconsideración que hoy se emite transcribe fielmente los antecedentes fácticos de este caso. Sin embargo, en aras de destacar la controversia medular del asunto que estuvo ante nuestra consideración, pasamos a exponer los detalles pertinentes a la contención neurálgica que hoy se reconsidera.

Allá para el 1 de noviembre de 2006, el Sr. Waldemar Fernández Rodríguez (en adelante señor Fernández) acudió al cuartel general de la policía acompañado por su abogado, el Lcdo. Luis Carbone (en adelante licenciado Carbone), y de un amigo. Una vez allí, el licenciado Carbone le indicó al sargento que los entrevistó –Sgto. José Curbelo Ortiz– que el señor Fernandez no haría declaración alguna, ya que se encontraba muy nervioso.[46] Poco tiempo después, el agente Curbelo procedió a leerle las advertencias pertinentes al señor Fernandez.[47] En específico, le indicó que tenía "derecho a permanecer

---

[46] Transcripción de la vista del 25 y 29 octubre 2009, pág. 41.
[47] Íd., pág. 11.

callado, (a que) todo lo que di(jera) podr(ía) ser usado en su contra,… (a) estar representado por un abogado… y a no declarar".[48]   Luego de esto, el licenciado Carbone, quien estuvo presente cuando le hicieron las advertencias de rigor al señor Fernández, nuevamente le indicó al agente Curbelo que su cliente no declararía en esos momentos.[49]   Igualmente lo reconoció dicho agente durante el interrogatorio que se le practicó en la vista preliminar, cuando reconoció que el señor Fernández invocó su derecho a no declarar.[50]

En vista de que el licenciado Carbone "se mantuvo diciendo(le) que su cliente estaba nervioso y que no iba a prestar declaración jurada en esos momentos"[51], el agente Curbelo inquirió a dicho abogado sobre "dónde se encontraba el arma que había utilizado su cliente con relación a es(os) hechos".[52]   En respuesta, el licenciado Carbone le ofreció información sobre la ubicación de la misma.   Acto seguido, el agente Curbelo informó  ese dato a una agente que se encontraba en la escena del crimen.   Minutos después, dicha agente contactó vía telefónica al agente Curbelo y le requirió pistas adicionales para poder dar con el paradero de las municiones y el cargador del

---

[48] Transcripción de la vista del 29 de octubre de 2007 y 7 de mayo de 2008, pág. 8.
[49] Transcripción de la vista 25 y 29 de octubre de 2007, pág. 12.
[50] Íd., pág. 49.
[51] Íd., pág. 39.
[52] Íd., pág. 12, pág. 37; Véase también, Transcripción de la vista del 29 de octubre de 2007 y 7 de mayo de 2008, pág. 9.

arma.[53] Ante ello, el agente Curbelo comunicó a la agente con el licenciado Carbone, quien finalmente le indicó a esta última el lugar preciso dónde se encontraba la evidencia que intentaban recuperar.

Así las cosas, tanto el testimonio del agente Curbelo como la evidencia ocupada en virtud de la información que el licenciado Carbone le ofreció a este, se presentó como evidencia en contra del señor Fernández. Ante ello, este solicitó la supresión alegando que eran producto directo de una comunicación privilegiada. El Tribunal de Primera Instancia declaró no ha lugar dicha petición, determinación que confirmó el foro apelativo.

Llegada la controversia a esta Curia, el señor Fernández alegó en su recurso de *certiorari* que "…la actuación **del Estado** vulneró (su) derecho contra la autoincriminación, el privilegio abogado-cliente y el derecho al debido proceso de ley." (Énfasis nuestro) Véase Alegato del peticionario, pág. 7. Indicó que resultaba "insostenible que, por un lado, se (le garantizara) el derecho contra la autoincriminación, y por otro lado, se requiera del representante legal de la persona información que está íntimamente entrelazada a tal derecho…". Íd. Pág. 20. Sostuvo que era aplicable a su caso la normativa atinente a la obtención de manifestaciones incriminatorias involuntarias por parte del Estado. Íd., pág. 23. Así, en Pueblo v. Fernández Rodríguez, supra, resolvimos la

---

[53] Íd., pág. 13.

controversia y ordenamos que se suprimieran el testimonio del agente Curbelo que involucraba materia privilegiada, así como el arma, el cargador y las municiones por ser producto de dicho testimonio.

Inconforme, el Procurador General acude nuevamente a este Tribunal mediante una moción de reconsideración parcial que se circunscribe a señalar que incidimos al excluir la evidencia real. Esto pues, sostiene que el Estado no cometió actuación ilegal alguna. El asunto de umbral que tenemos ante nuestra consideración es el siguiente: si atendiendo específicamente las contenciones del señor Fernández, la exclusión de la comunicación privilegiada -en el contexto de la relación abogado-cliente- debió conllevar automáticamente la exclusión de sus frutos evidenciarios. Reconsideramos este particular, recordando lo que antes hemos expresado, en cuanto a que "el 'temor de que se nos tache de inconsistentes no debe impedir que reconsideremos' la actuación, o decisión, errónea que hayamos emitido en un caso en particular". Lebrón v. Díaz, 166 D.P.R. 89, 90 (2005), Reyes Coreano v. Director Ejecutivo, 110 D.P.R. 40, 42 (1980).

II

A

La evidencia derivativa es aquella que se ocupa como "fruto" de una evidencia primaria. Ese concepto se utiliza generalmente para identificar aquella evidencia secundaria

que se deriva de una evidencia ilegalmente obtenida.[54] Pueblo v. Miranda Alvarado, 143 D.P.R. 356, 371 (1997).

Así pues, en la tramitación de los casos criminales existen varias razones por las cuales se puede excluir evidencia de esta índole.[55] Estas instancias son las siguientes: cuando la exclusión está estatuida en alguna ley estatal; cuando aplica la regla de exclusión de evidencia que se deriva de la doctrina conocida como "fruto del árbol ponzoñoso", o; ante la existencia de alguna ley federal relacionada a ese asunto. Véase, en general, James J. Dalessio, Evidentiary Privileges and the Exclusion of Derivative Evidence: Commentary and Analysis, 26 San Diego L. Rev. 625 (1989).

Es preciso señalar que la exclusión de evidencia que se hace bajo el supuesto de que **el Estado** cometió alguna actuación ilegal, lleva en sí un propósito intrínsecamente disuasivo, pues los remedios para excluir evidencia son una "medicina fuerte" que normalmente se reserva para las instancias en que ocurran violaciones constitucionales. United States v. White, 879 F.2d 1509, 1513 (7th Cir.

---

[54] Como regla general, este tipo de evidencia es una "cuyo origen está vinculado estrechamente a la evidencia obtenida originalmente en violación de la protección constitucional" que provee la Sec. 10 de nuestra Carta de Derechos contra arrestos y allanamientos ilegales, Art. II sec. 10, Const. P.R., L.P.R.A. Tomo 1, Ed. 2008. Pueblo v. Miranda Alvarado, 143 D.P.R. 356, 371 (1997).

[55] Se ha expresado que: "[t]here is a derivative evidence component to most of the constitutional exclusionary rules". E. J. Imwinkelried, The New Wigmore: A treatise on evidence: evidentiary privileges, Ed. 2, Sec. 6.6.6. Aspen Publishers, Vol. 2, pág. 709

1989). Por tal razón, el Tribunal Supremo federal ha enfatizado que:

> Fundamental to suppressing fruits is a deterrence rationale that the derivative evidence should generally be suppressed to deter the government from future violations of constitutional rights. United States v. Leon, 468 U.S. 897, 908-13 (1984). Véase también, United States v. White, supra.

Según indicamos, una de las instancias en que procede excluir evidencia ocupada por el Estado es cuando aplica la doctrina del "fruto del árbol ponzoñoso". La Opinión en reconsideración que hoy se emite correctamente recoge el tratamiento jurisprudencial atinente a la misma. En esencia, esta doctrina, con sus excepciones, encuentra su origen en la jurisprudencia federal norteamericana. Desde principios de siglo el Tribunal Supremo federal la adoptó al interpretar la Cuarta Enmienda de la Constitución de Estados Unidos, con el propósito de lograr un balance adecuado entre el "interés de encausar a los transgresores del orden social y el de disuadir a los oficiales que protegen y mantienen el orden público de recurrir a medios o procedimientos ilegales, violentando de esa manera los derechos constitucionales de cada ciudadano". Op. disidente del Juez Asociado señor Rebollo López, Pueblo v. Negrón Martínez I, 143 D.P.R. 1, 16 (1997). Véase

Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920).[56]

Según señala el Prof. Ernesto L. Chiesa, la "regla de exclusión" que establece la doctrina del fruto del árbol ponzoñoso se extiende a "evidencia derivativa" que ha sido obtenida como "fruto" de evidencia primaria obtenida ilegalmente. E.L. Chiesa Aponte, Derecho procesal penal de Puerto Rico y Estados Unidos, 1ra ed., Colombia, Ed. Forum, 1991, Vol. I,  pág. 317; Pueblo v. Negrón Martínez I, supra.  Esto es, "a otra evidencia cuyo origen está

_____

[56] Resulta interesante cómo en una concisa, pero directa opinión, el Tribunal Supremo federal reconoce la necesidad de hacer funcional la norma establecida en la Carta Magna de Estados Unidos. Veamos:

> The Government now, while in form repudiating and condemning the illegal seizure, seeks to maintain its right to avail itself of the knowledge obtained by that means which otherwise it would not have had.

> The proposition could not be presented more nakedly. It is that although of course its seizure was an outrage which the Government now regrets, it may study the papers before it returns them, copy them, and then may use the knowledge that it has gained to call upon the owners in a more regular form to produce them; that the protection of the Constitution covers the physical possession but not any advantages that the Government can gain over the object of its pursuit by doing the forbidden act. Weeks v. United States, 232 U. S. 383, 34 Sup. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177, to be sure, had established that laying the papers directly before the grand jury was unwarranted, but it is taken to mean only that two steps are required instead of one. In our opinion such is not the law. **It reduces the Fourth Amendment to a form of words. The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all.** Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed. (Énfasis nuestro y citas internas omitidas.) Silverthorne Lumber Co. v. United States, 251 U.S. 385, 391-92 (1920).

vinculado estrechamente a la evidencia obtenida originalmente en violación de la protección constitucional". E.L. Chiesa Aponte, op. cit. En cuanto a esto, conviene resaltar lo que nos instruye el tratadista La Fave, tal como se reseña en la Opinión en Reconsideración de autos, en cuanto a que "...la doctrina del 'fruto del árbol ponzoñoso' no se limita a los casos en que se ha violado la Cuarta Enmienda, supra, sino que también se ha utilizado cuando han ocurrido otras violaciones constitucionales, como las ruedas de detenidos y las confesiones obtenidas en violación a los derechos constitucionales". Opinión en reconsideración, págs. 8-9, citando a La Fave, Search and Seizure: A treatise on the fourth amendment, Vol. 6 Sec. 11.4, pág. 257 (2004). En ese sentido, la regla de exclusión también se ha aplicado cuando se obtiene evidencia secundaria fruto de violaciones a limitaciones no constitucionales, pero que están estatuidas legalmente. La Fave, op. cit.

Destacamos que es acertada la discusión de la Opinión mayoritaria en reconsideración en cuanto a que para que aplique la referida regla de exclusión es necesario que el Estado incurra en alguna actuación estatal ilegal o inconstitucional al obtener la pieza evidenciaria que se intenta excluir. A pesar de esto, entendemos que sí podrían suscitarse situaciones en las cuales sería procedente excluir los frutos evidenciarios de la

divulgación    de    una    comunicación    privilegiada    -y
aclaramos- **en el contexto de la relación abogado-cliente**.

B

Si  bien  es  cierto  que  el  privilegio  abogado-cliente
no  está  investido  de  cualidad  constitucional  alguna,  en
casos  criminales  existen  situaciones  en  que  este  estará
estrechamente  relacionado  con  derechos  constitucionales
fundamentales  de  un  sospechoso  o  acusado.  Ante  esa
particular  situación,  se  ha  planteado  que  la  violación  del
privilegio  abogado-cliente  debe  tratarse  como  se  tratan
las  violaciones  constitucionales  cuando  ese  privilegio
suplementa  algún  derecho  de  raigambre  constitucional,  como
lo  sería  el  derecho  a  representación  legal  adecuada  que
surge  de  la  Sexta  Enmienda  de  la  Constitución  federal,  el
derecho  a  no  autoincriminarse  de  la  Quinta  Enmienda  y  el
debido  proceso  de  ley  que  emana  de  la  Decimocuarta
Enmienda.[57]  Véase, United States v. Neill, 952 F. Supp.
834,  839  (D  DC  1997);  B.P.  Saul,  Constitutional  and
Evidentiary  Issues,  2  Attorney-Client  Privilege  in  the
U.S., Cap. 10, Sec. 10:10 (2012).

Desde  hace  décadas,  se  propuso  que  el  privilegio
abogado-cliente  es  una  garantía  contra  el  menoscabo  al
derecho    contra    la    autoincriminación    y    el    derecho
constitucional    a    una    representación    legal    adecuada.
Véase, The Attorney Client Privilege: Fixed rules,

---

[57] Emdas. V, VI, XIV, EE. UU., L.P.R.A., Tomo 1, ed. 2008.

balancing, and constitutional entitlement, 91 Harv. L. Rev. 464, 485 (1977). Esto, ya que el privilegio abogado-cliente, a pesar de que no se ha elevado a rango constitucional, es clave para ejercer tales prerrogativas constitucionales. United States v. Neill, supra; United States v. White, supra. Por tanto, es correcto concluir que el hecho de que el privilegio abogado-cliente no sea de índole constitucional, no implica que el Estado pueda ganar acceso a comunicaciones privilegiadas mediante conducta que mine derechos constitucionalmente reconocidos. Véase, E.D. Macarthur, The Search and seizure of privileged attorney-client communications, 72 U. Chi. L. Rev. 729 (2005). En ese sentido, precisa examinar si procede excluir los frutos de la divulgación de una comunicación cobijada por el privilegio abogado-cliente considerando la normativa atinente a la exclusión de evidencia.

Según indicamos anteriormente, el privilegio abogado-cliente está ligado a los derechos constitucionales contra la autoincriminación y el derecho a asistencia de abogado. El texto de la Sexta Enmienda de la Constitución federal establece que en todas las causas criminales, el acusado gozará, entre otros, del derecho a la asistencia de un abogado para su defensa. Enmienda VI, Const. EE.UU., L.P.R.A., Tomo I, ed. 2008. Bajo la aludida disposición, el derecho a asistencia de abogado se activa luego de la iniciación de los procedimientos acusatorios de manera

formal. <u>Kirby v. Illinois</u>, 406 U.S. 682, 689 (1972). Por otra parte, cuando se ha centralizado una investigación sobre un individuo, a este le cobijan los derechos que emanan de la Quinta Enmienda de la Constitución de Estados Unidos, entre ellos, el derecho a asistencia de abogado para asegurar su derecho a la no autoincriminación. Véase E.L. Chiesa Aponte, <u>op. cit</u>., pág. 66.

En Puerto Rico, la Sec. 11 del Art. II de la Constitución garantiza que en todos los procesos criminales, el acusado disfrutará, entre otros, del derecho a asistencia de abogado. Art. 2 Sec. 11, Const. P.R., L.P.R.A., Tomo 1, Ed. 2008, pág. 343. Esta prerrogativa también se ha consagrado como parte fundamental de la cláusula del debido proceso de ley. <u>Pueblo v. Ortiz Couvertier</u>, 132 D.P.R. 883 (1993). De esta forma, hemos reconocido el derecho de un acusado al disfrute de asistencia legal en la etapa investigativa cuando esta toma carácter acusatorio, en el acto de lectura de acusación, durante el juicio, al dictarse sentencia y en la fase apelativa. Íd.[58] Véase, <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).[59]

---

[58] En cuanto a las disposiciones de las cuales emana el derecho a asistencia de abogado, el Profesor Chiesa nos aclara lo siguiente:

"No cabe duda alguna de que, actualmente, el derecho a asistencia de abogado durante el interrogatorio bajo custodia del sospechoso emana de la Enmienda Quinta como corolario del privilegio contra la autoincriminación y no, del derecho a asistencia de abogado en la Enmienda Sexta." E.L. Chiesa Aponte, <u>Derecho procesal penal de Puerto Rico y Estados Unidos</u>, 1ra ed., Colombia, Ed. Forum, 1991, Vol. 1,

Es meritorio apuntar que el derecho constitucional a asistencia de abogado claramente alberga en sí la protección de la confidencialidad de las comunicaciones entre el acusado y su representante. United States v. Henry, 447 U.S. 264, 295 (1980) (Opinión disidente del Juez Rehnquist). Así pues, el concepto de la relación abogado-cliente se interseca con la Quinta y Sexta Enmienda en la medida en que estas requieren una representación legal adecuada: ya sea durante un interrogatorio al sospechoso, previo a la iniciación del procedimiento criminal formal o luego de comenzado este. Ante ese escenario, una de las instancias en que puede ocurrir una vulneración al derecho a una representación legal adecuada es cuando el Estado interviene ilegalmente en la relación abogado-cliente para obtener información privilegiada y utiliza esa información para obtener evidencia en contra del imputado. Véase, United States v. Neil, supra. En United States v. Lin Lyn Trading, Ltd.,

---

pág. 66. Véase también, Massiah v. United States, 377 U.S. 201 (1964).

Nos señala además que el derecho a asistencia de abogado que emana directamente de la Enmienda Sexta solo se activa tras la denuncia o acusación- es decir, con el comienzo de procedimientos adversativos formales. Chiesa, op. cit., pág. 66. Bajo nuestro entramado de reglas procesales criminales esto significa que se activa el derecho a asistencia de abogado luego de la presentación de una denuncia, acusación, determinación de causa probable para el arresto, o, comparecencia ante magistrado tras la realización de un arresto sin orden. Íd., pág. 65, esc. 41.

[59] Cabe aclarar que en este caso la corte enfatizó que ante un interrogatorio de un sospechoso bajo custodia, para proteger el derecho contra la autoincriminación, es necesario que se le haga al individuo las advertencias sobre sus derechos constitucionales, lo que se ha conocido como los "Miranda rights".

925 F. Supp. 1507, 1517 (D. Utah 1996)[60] se dijo lo

siguiente:

> ... intentional intrusion into the attorney-
> client relationship constitutes a direct
> interference with the Sixth Amendment rights of
> a defendant, and because a fair adversary
> proceeding is a fundamental right secured by the
> Sixth and Fourteenth Amendments, we believe that
> absent a countervailing state interest, such an
> intrusion must constitute a per se violation of
> the Sixth Amendment. In other words, we hold
> that when the state becomes privy to
> confidential communications because of its
> *purposeful intrusion into the attorney-client*
> *relationship and lacks a legitimate*
> *justification for doing so, a prejudicial effect*
> *on the reliability of the trial process must be*
> *presumed.*

Por otro lado, la intrusión del Estado en la relación

abogado-cliente puede ser de tal magnitud que también configure

una violación al debido proceso de ley. Véase, R.P. Mosteller,

Admissibility of fruits of breached evidentiary privileges: The

importance of adversarial fairness, party culpability, and fear

of immunity, 81 Wash. U. L.Q. 961 (2003). Véase también, United

States ex rel. Shiflet v. Lane, 815 F.2d 457 (7th Cir. 1987).

Así pues, se ha resuelto que cuando el Estado transgrede

los derechos que dimanan de la Quinta, Sexta o Decimocuarta

enmienda de la Constitución federal y, en consecuencia, obtiene

evidencia a través de la intrusión intencional e inadecuada en

los derechos constitucionales de una persona, el remedio

correspondiente en el procedimiento criminal se limita a negarle

a la Fiscalía los frutos de la transgresión. United State v.

---

[60] Citando a Shillinger v. Haworth, 70 F.3d 1132, 1142 (10th Cir.1995)

Morrison, 449 U.S. 361, 366 (1980); Shillinger v. Haworth, 70 F. 3d 1132, 1143 (10th Cir. 1995).[61]

Al repasar los hechos de este caso, vemos que la defensa del señor Fernández se limitó a reclamar la supresión de evidencia y desestimación de los cargos amparándose en que el Estado violentó su derecho constitucional a no autoincriminarse, el privilegio abogado-cliente, y su derecho a un debido proceso de ley. Ciertamente, reiteramos, por los fundamentos expuestos en Pueblo v. Fernández Rodríguez, supra, que las partes del testimonio que involucraban materia privilegiada no debieron admitirse en evidencia. Ahora bien, circunscribiéndonos a los reclamos de la defensa, es forzoso concluir que no procede lo solicitado puesto que en este caso el Estado no cometió acción ilegal alguna que infringiera los derechos constitucionales del señor Fernández, ni su privilegio abogado-cliente. Se desprende de los testimonios vertidos en el TPI que el licenciado Carbone divulgó voluntariamente, sin coacción alguna por parte del agente Curbelo, información confidencial. Por tanto, no procede suprimir la evidencia derivativa. Ello pues, en este caso no cabe la menor duda de que está

---

[61] En este último caso se expresó que: "Morrison (United State v. Morrison, 449 U.S. 361 (1980)) makes clear that evidence obtained through an intentional and improper intrusion into a defendant's relationship with his attorney, as well as any "fruits of [the prosecution's] transgression" must be suppressed in proceedings against him".(Citas internas omitidas).

ausente alguna acción inconstitucional o ilegal atribuible al Estado.[62]

### III

Por los fundamentos que anteceden, concurrimos con la Opinión en reconsideración que hoy se emite.


Edgardo Rivera García
Juez Asociado

---

[62] Tal como se mencionó en US. v. Neill, 952 F. Supp. 834, 839 (D DC 1997), "[n]onetheless, not every intrusion on the attorney-client privilege constitutes a constitutional violation, an intrusion may result in a constitutional violation if privileged information is intentionally obtained and used to the defendant's detriment at trial".